# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| GENE SCHWARTZ, | : | Case No. 1:17-cv-284 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| UNIVERSITY OF CINCINNATI | : | |
| COLLEGE OF MEDICINE, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Docs. 32, 34) AND DENYING PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 35)

This civil case is before the Court on the motion for summary judgment of

Defendants UC Health, Andrew Filak, and David Bernstein (Doc. 32); and the motion for

summary judgment of Defendants University of Cincinnati College of Medicine ("UC

College of Medicine") and Kimberly Risma (Doc. 34); as well as the parties' responsive

memoranda (Docs. 41, 44, 45). Also before the Court is Plaintiff Gene Schwartz's cross-

motion for partial summary judgment (Doc. 35) and the parties' responsive memoranda

(Docs. 37, 39, 43).

## I. BACKGROUND

Plaintiff Gene Schwartz filed this action against the Defendants surrounding his

termination from a post-graduate Allergy and Immunology Fellowship Program

("fellowship program") after speaking out about perceived sex discrimination against

himself and his same-sex spouse. (Doc. 1). Plaintiff asserts that his termination from the

program constituted retaliation in violation of Title VII, as well as a violation of his First Amendment right to free speech. (*Id.* at 9-10). Schwartz also alleges that he was terminated without having been afforded adequate procedural due process under the Fourteenth Amendment. (*Id.* at 10).

Schwartz was hired as a clinical fellow in the allergy fellowship program by UC Health in July 2015. (Doc. 32-1 at ¶ 14; Doc. 42 at ¶ 14).[1] The fellowship program consists of both a clinical and academic component. (Doc. 32-1 at ¶ 10; Doc. 42 at ¶ 10). UC Health, a private healthcare system, collaborates with the UC College of Medicine to provide the academic component of the program. (24-1 at 23; Doc. 32-1 at ¶ 12; Doc. 42 at ¶ 12). UC College of Medicine faculty oversee the program and develop its curriculum. (Filak Depo. at 12-13). The University of Cincinnati Medical Center ("UC Medical Center") is one of UC Health's hospitals. (Doc. 32-1 at ¶ 2; Doc. 42 at ¶ 2). Both entities are privately owned and operated. (Doc. 32-1 at ¶ 3; Doc. 42 at ¶ 3).

During the relevant period, Defendant Andrew Filak was the Vice President of Education and the Designated Institutional Official ("DIO") for Graduate Medical Education for UC Health/UC Medical Center. (Doc. 32-1 at ¶ 5; Doc. 42 at ¶ 5; Filak Depo. at 11, 14). He also held the position of Senior Associate Dean for Academic

---

[1] Pursuant to the Standing Order of the Court, the parties filed Statements of Proposed Undisputed Facts and responses. (Docs. 32-1, 34-1, 35-1, 38, 40, 42). The Court's statement of facts set forth herein incorporates the facts undisputed by the parties and the facts confirmed by the Court upon review of the citations to the evidentiary record provided by the parties. In addition, while Defendants UC College of Medicine and Dr. Risma and Defendants UC Health, Dr. Filak, and Dr. Bernstein proposed their own sets of undisputed facts and responded separately to the Plaintiff's proposed undisputed facts, the Defendants' separate proposals and responses are nearly identical. Thus, for the sake of simplicity, the Court will cite to only one set unless it is necessary to cite to both.

Affairs at UC College of Medicine, with the College acting as his direct employer and UC Health reimbursing the College for part of his salary. (Filak Depo. at 7; Doc. 32-1 at ¶ 6; Doc. 42 at ¶ 6). Defendant Kimberly Risma is the Director of the allergy fellowship program, and Defendant David Bernstein is the Assistant Director of the fellowship program. (Doc. 32-1 at ¶¶ 7-8; Doc. 42 at ¶¶ 7-8). Defendants Risma and Bernstein supervise fellows for UC Health and Cincinnati Children's Hospital. (Doc. 32-1 at ¶ 9; Doc. 42 at ¶ 9). They also both have faculty appointments at UC College of Medicine.[2] (Risma Depo. at 7; Bernstein Depo. at 5-6).

Upon entering the fellowship program, Plaintiff signed a Graduate Medical Education Contract ("GME Contract") with UC Health on behalf of UC Medical Center. (Doc. 24-1 at 21; Doc. 32-1 at ¶ 16; Doc. 42 at ¶ 16). The GME Contract states that Plaintiff "shall be an employee of UC Health" and sets forth Plaintiff's compensation, with a stipend and benefits provided by UC Health. (Doc. 24-1 at 21; Doc. 32-1 at ¶ 15; Doc. 42 at ¶ 15). The contract also incorporates the UC Medical Center Graduate Medical Education Standard Terms and Conditions ("terms and conditions") and provides that the Medical Center may terminate the GME Contract at any time for grounds specified in the terms and conditions. (Doc. 24-1 at 21).

---

[2] Dr. Risma testified that Cincinnati Children's Hospital (a private hospital) is her sole employer and pays her full salary. (Risma Depo. at 6-7). Dr. Bernstein testified, somewhat unclearly, that he is employed by "UC Health at University of Cincinnati." (Bernstein Depo. at 5-6). Plaintiff asserts, based on Dr. Bernstein's deposition testimony, that Bernstein is an employee of the College; however, it is unclear whether the College of Medicine pays part of his salary. Cautiously, for purposes of the summary judgment analysis, the Court assumes that Dr. Bernstein was an employee of both UC Health and UC College of Medicine during the relevant period.

The standard terms and conditions incorporated by the GME Contract state that the "The Residency Program is a collaboration between UC [Medical Center] and the University of Cincinnati College of Medicine" and further state that "[t]he academic components of the Residency Program are developed and supervised by the College, which is solely responsible for determining whether a resident has satisfactorily completed the academic requirements of the Residency Program." (*Id.* at 23). Moreover, the terms and conditions provide that the "Resident acknowledges that nothing in the GME Contract or these Standard Terms & Conditions shall be deemed to make Resident a public employee or an employee of the University of Cincinnati[.]" (*Id.* at 24).

Relevant to the instant case, the terms and conditions also address certain restrictions on "moonlighting"—engaging in work outside of the fellowship program. (*Id.* at 27). More specifically, the terms and conditions require fellows to gain permission from the program director prior to engaging in any moonlighting activities and note that fellows must comply with the moonlighting policies of UC Health, UC Medical Center, and the University of Cincinnati College of Medicine. (*Id.*).

Finally, the terms and conditions set forth two separate processes used to address academic deficiencies and misconduct. (*Id.* at 31). The misconduct process (contained in Section 4.2), under which Plaintiff was terminated, permits the program director, in consultation with the DIO, to conduct an inquiry into an identified issue. (*Id.* at 34; Doc. 35-1 at ¶ 34; Doc. 38 at ¶ 34). After consultation with the program director, the DIO may

"remove a Resident[3] from duty (with or without pay) pending the outcome of the inquiry." (Doc. 24-1 at 34). The inquiry consists of an internal investigation by "a neutral physician, member of human resources or other appropriate person" who reviews any documentation and meets with witnesses, including the resident. (*Id.* at 35). Based on the report of the inquiry, the program director makes a recommendation to the DIO regarding a final action, which may include dismissal. (*Id.*). The DIO is responsible for making the final determination. (*Id.*). There is no appeal process for disciplinary action based on misconduct. (*Id.*).

Schwartz claims he was improperly terminated from the program after speaking out about an incident that occurred at a dinner hosted by The Finity Group, a private financial company, in October 2015. (Doc. 1; Doc. 41 at 21-27, 30-31). The allergy fellowship program coordinator, Shakeith Lawson, forwarded an e-mail to fellows, including Plaintiff, from The Finity Group advertising an informational dinner for new physicians at a restaurant in Northern Kentucky. (Doc. 32-1 at ¶ 33; Doc. 42 at ¶ 33). Lawson's forwarded e-mail stated in full, "Fellows, see below." (Doc. 26-1 at 30). Plaintiff attended the dinner with his same-sex spouse. (Doc. 35-1 at ¶ 11; Doc. 38 at ¶ 11). Plaintiff arrived at the dinner late and entered the restaurant ahead of his spouse who was parking the car. (Doc. 32-1 at ¶¶ 40, 42; Doc. 42 at ¶¶ 40, 42). According to Plaintiff, a Finity Group representative told Plaintiff to wait outside of the private dining room where the presentation was taking place. (Doc. 35-1 at ¶ 12). Plaintiff asserts that

---

[3] The terms "resident" and "fellow" are used interchangeably in the terms and conditions. (Doc. 24-1 at 23).

after he and his spouse were seated outside the private dining room and in the main restaurant, a heterosexual couple arrived and were seated in the private dining room prior to the end of the presentation. (*Id.* at ¶ 13). This caused Plaintiff to suspect that he and his spouse were being discriminated against because they were a same-sex couple. (*Id.* at ¶ 14). The Finity Group paid for Plaintiff and his husband's meal, and also gave them a personal presentation about their financial services. (Doc. 32-1 at ¶ 41; Doc. 42 at ¶ 41).

Following his experience at the dinner, Schwartz e-mailed Lawson suggesting that UC avoid having future business with The Finity Group as they "practice discrimination," (Doc. 26-1 at 29-30), to which Lawson replied that her e-mail forwarding the invitation was "FYI only." (*Id.* at 29). Plaintiff proceeded to e-mail Dr. Filak, UC Medical Center's DIO, about the incident, stating, "If possible please consider trying to disassociate UC from the below financial advisor business group. Being associated with discrimination is definitely not what is needed for UC or Cincinnati." (*Id.*). Dr. Filak responded as follows:

> Dear Dr. Schwartz,
>
> This appears to be something that was arranged by your program. The Office of GME has had nothing to do with this and I am not at al [sic] familiar with this group. As an institution we do not typically advocate for such firms. If a firm approaches us and asks us to send out announcements or advertisements we run it by the Resident Advisory Council to see if there is interest before sending it out. It does not appear that this program was in any way advertised by UC or UCMC. As stated above, it seems to have been done at the program level.
>
> By copy of this I am asking Dr. Bunger to forward this email to your program director to make sure she is aware of your concerns as I do not have access to her email address at this time.

Thanks for sharing this with me.

(*Id.* at 28). Plaintiff responded to Dr. Filak by stating, "[t]hank you and no need to bother Dr. Risma" as "she has nothing to do with this." (*Id.*).

On November 30, 2015, Dr. Risma and Dr. Bernstein issued a "Letter of Deficiency" to Plaintiff (part of the academic deficiency process outlined in the GME standard terms and conditions), which included as a "concern" Plaintiff's request to the DIO to disassociate all UC trainees with a particular business organization (The Finity Group). (Doc. 24-2 at 14-16). The deficiency letter noted that Plaintiff had no personal relationship with the DIO and that he was complaining about a "personal grievance" he had with The Finity Group. (*Id.*). This was one of four concerns listed in the letter, which described, in general, Plaintiff's lack of interpersonal skills and professionalism. (*Id.* at 15). The letter further noted that in a prior meeting with Plaintiff, he was advised to stop communicating "about personal issues with colleagues that you are not close to" and to instead raise those issues with the program directors or Plaintiff's program coordinator. (*Id.*). As another example, the letter stated that on a prior occasion, Schwartz e-mailed the president of the University about personal issues. (*Id.*). Plaintiff met with Dr. Risma and Dr. Bernstein several more times to discuss his perceived professionalism issues. (Doc. 35-1 at ¶ 20; Doc. 38 at ¶ 20). Dr. Bernstein also testified that Plaintiff was struggling with his research, which was progressing slowly. (Bernstein Depo. at 58).

In January 2016, Plaintiff signed a consultant agreement with Inflamax, an outside company, and attended a three-hour training session, submitting an invoice for the time

he spent at the session. (Doc. 32-1 at ¶¶ 87, 91; Doc. 42 at ¶¶ 87, 91). Plaintiff admits he did not have prior approval to work at Inflamax and that approval is required in advance of any moonlighting activities pursuant to the program's moonlighting policy. (Doc. 32-1 at ¶ 97; Doc. 42 at ¶ 97). Dr. Filak opened an investigation into Plaintiff's suspected moonlighting violation on February 3, 2016, appointing two UC Medical Center human resource employees, Michael Webster and Angie Head, to conduct the investigation. (Doc. 35-1 at ¶ 36; Doc. 38 at ¶ 36).

After reviewing documentation, including e-mails, Plaintiff's invoice to Inflamax, and the GME contract, and after meeting with the Plaintiff and with Dr. Risma, Webster and Head compiled a report concluding that "there is substantial and credible evidence that Dr. Schwartz engaged in misconduct by moonlighting without permission" in violation of the moonlighting policy and the GME Contract and that Schwartz attempted to conceal his moonlighting activity. (Doc. 24-3 at 23-24). Webster and Head then met with Schwartz for a second time and reviewed additional documentation he provided. (Doc. 24-6 at 1-3). However, this new information did not alter their original conclusion. (*Id.* at 3).

On February 25, 2016, Drs. Risma and Bernstein issued a letter recommending dismissal of Schwartz from the fellowship program, documenting his history of unprofessional conduct, including his moonlighting violation, improper access of his medical records, and his tendency to contact high-level officials about personal problems. (Doc. 24-6 at 4-7). The letter also noted several complaints from his peers, Medical Center staff, and clinical supervisor concerning his unprofessional behavior. (*Id.* at 5-6).

Based on the recommendation of Drs. Risma and Bernstein, Dr. Filak issued a final decision dismissing Schwartz from the fellowship program on March 1, 2016. (*Id.* at 8). Dr. Filak's letter acknowledged Drs. Risma and Bernstein's summary of Schwartz's "history of unprofessional behavior," including the moonlighting violation. (*Id.*).

Plaintiff filed the instant action against UC Health, UC College of Medicine, Dr. Risma, Dr. Bernstein, and Dr. Filak on April 28, 2017. On May 5, 2018, the Court granted in part and denied in part Defendants' motion for judgment on the pleadings. (Doc. 18). Defendants have now moved for summary judgment on Plaintiff's remaining claims (Docs. 32, 34), which consist of the following:

| | |
|---|---|
| Count 1: | 42 U.S.C. § 1983 claim against UC College of Medicine, Dr. Filak, Dr. Risma, and Dr. Bernstein for violation of the right to free speech; |
| Count 3: | 42 U.S.C. § 1983 claim against UC College of Medicine, Dr. Filak, Dr. Risma, and Dr. Bernstein for violation of the right to procedural due process; |
| Count 4: | Retaliation claim against UC College of Medicine and UC Health alleging that Plaintiff's termination was retaliation for Plaintiff's engaging in protected activity, namely opposing acts of sexual discrimination in violation of Title VII. |

(Doc. 1 at 9-10). Plaintiff has moved for summary judgment with respect to his procedural due process claim (Count 3) only. (Doc. 35).

## II.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

As the parties have filed cross-motions for summary judgment regarding Plaintiff's procedural due process claim, each party bears the burden of establishing, with respect to that claim, that no genuine issue of material fact exists and that the party is entitled to judgment as a matter of law. *See Stillwagon v. City of Delaware*, 274 F. Supp. 3d 714, 739-40 (S.D. Ohio 2017). In other words, the standard for cross-motions for summary judgment does not differ from the standard applied when only one motion for summary judgment is filed, and the court must "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Id.* (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994)).

## III.    ANALYSIS

### A.    Plaintiff's § 1983 claims

Schwartz asserts two constitutional claims against UC College of Medicine and Drs. Risma, Bernstein, and Filak via 42 U.S.C. § 1983. Plaintiff alleges these Defendants violated his First Amendment right to free speech by terminating him from the fellowship program for complaining about the alleged discrimination he experienced at the Finity Group dinner. (Doc. 1 at 9). Schwartz also claims the Defendants denied him adequate due process under the Fourteenth Amendment by not providing him an opportunity to challenge his termination by way of a hearing before a neutral panel. (*Id.* at 10). Plaintiff's complaint specifies that he is suing the individual defendants both in their individual and official capacities. (*Id.* at 4). Further, Plaintiff seeks injunctive relief in the form of reinstatement as a fellow in the allergy fellowship program, as well as compensatory and punitive damages. (*Id.*).

Under the Eleventh Amendment, states generally enjoy immunity from suit, regardless of the remedy sought. *In re Ohio Execution Protocol Litig*, 709 F. App'x 779, 782 (6th Cir. 2017). This immunity extends to arms of the state, such as public universities, as well as state officers sued in their official capacity. *Id.*; *see also Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 654-55 (S.D. Ohio 2016) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000)). This is because courts consider suits against an arm of the state or state agent in his official capacity to be "no different from a suit against the State itself." *Id.* (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). Yet, there is an exception to sovereign immunity for claims against state

officers sued in their official capacity to the extent a plaintiff is seeking prospective injunctive relief. *Id.* at 654; *see also Carten v. Kent State Univ.*, 282 F.3d 391, 395 (6th Cir. 2002) (citing *Ex parte Young*, 209 U.S. 123, 129 (1908)).

The Sixth Circuit has recognized the University of Cincinnati as an arm of the state for purposes of the Eleventh Amendment. *Johnson*, 215 F.3d at 570; *see also Saqr v. Univ. of Cincinnati*, No. 1:18-cv-542, 2019 WL 699347, at *3 (S.D. Ohio Feb. 20, 2019) (recognizing UC College of Medicine as arm of the state); *Ali Al-Maqablh v. Univ. of Cincinnati College of Med.*, No. 1:11-cv-531, 2012 WL 3929809, at *5 (S.D. Ohio Sept. 10, 2012) (same). Consequently, Plaintiff's § 1983 claims against UC College of Medicine are barred by the Eleventh Amendment. *See McKenna v. Bowling Green State Univ.*, 568 F. App'x 450, 457 (6th Cir. 2014). Plaintiff's official capacity claims against the individual defendants, Drs. Filak, Bernstein, and Risma, are also barred to the extent Plaintiff seeks monetary damages. *Id.*

However, under the exception established in *Ex parte Young*, Plaintiff's claims against the individual defendants in their official capacities are permissible to the extent Plaintiff seeks reinstatement, which the Sixth Circuit has recognized as a form of prospective injunctive relief. *Carten*, 282 F.3d at 396; *see also Doe v. Ohio State Univ.*, 219 F. Supp. 3d at 654. Plaintiff's individual capacity claims against Drs. Filak, Risma, and Bernstein for damages are also not barred by the Eleventh Amendment. *See Maben v. Thelen*, 887 F.3d 252, 270-71 (6th Cir. 2018).

### i.    State action

As a threshold matter, Defendants argue that Plaintiff's § 1983 claims fail as a matter of law because Plaintiff's termination did not constitute state action.  The individual defendants assert that their actions were not taken on behalf of UC College of Medicine, but rather, in their various roles for UC Health, a private healthcare system, or UC Medical Center, one of its hospitals.  For the reasons stated below, the Court agrees.

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law.  Anyone whose conduct is 'fairly attributable to the state can be sued as a state actor under § 1983." *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 478 (6th Cir. 2014) (quoting *Filarsky v. Delia*, 132 S.Ct. 1657, 1661 (2012)).  All actions taken by a public employee are not automatically deemed state action for purposes of § 1983.  *See Libertarian Party of Ohio v. Husted*, 188 F.Supp. 3d 665, 672 (S.D. Ohio 2016) (citing *Memphis, Tennessee Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 903 (6th Cir. 2004) ("It is the nature of the act performed, not the clothing of the actor or even the status of being on-duty, or off-duty, which determines whether the officer acted under color of law.")).  "[A] public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."  *Id.* (quoting *West v. Atkins*, 487 U.S. 42, 50 (1988) ("[A]cting under color of state law requires that a defendant in a § 1983 action have exercised the power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed by the authority of state law.").

Courts rely on four tests to determine whether challenged conduct is "fairly attributable to the state": (1) the public function test, (2) the state compulsion test, (3) the symbiotic relationship or nexus test, and (4) the entwinement test. *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014). Despite the development of four separate tests to assess whether a particular defendant is a state actor, "the Supreme Court has made clear that all of our various 'criteria' boil down to a core question: whether 'there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 676 (6th Cir. 2018) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). This is a fact-specific inquiry. *Siskaninetz v. Wright State Univ.*, 175 F. Supp. 2d 1018, 1023 (S.D. Ohio 2001); *see also Brentwood Acad.*, 531 U.S. at 295, 299 ("[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient . . . .").

Plaintiff argues that state action is apparent under the nexus test, as the fellowship program is the product of collaboration between UC Medical Center, UC Health, and UC College of Medicine, making it impossible to separate out the public aspects of the program. (Doc. 41 at 17-18). However, under the nexus test, courts are required to assess the connection between the *challenged conduct* and the state, rather than simply examine the relationship between the state and a private entity. *Marie*, 771 F.3d at 363 (citing *Wilcher v. City of Akron*, 498 F.3d 516, 520 (6th Cir. 2007)); *see id.* ("[M]ere cooperation simply does not rise to the level of merger required for a finding of state

action.") (quoting *Lansing v. City of Memphis*, 202 F.3d 821, 831 (6th Cir. 2000)). Thus, the Court must do more than consider the extent to which UC Health and UC Medical Center collaborate with UC College of Medicine to develop and implement the allergy fellowship program and must instead consider the extent to which UC College of Medicine was involved in the challenged conduct—the termination of Plaintiff from the program.

That the individual defendants were faculty or employees of UC College of Medicine does not necessarily mean they were acting under the authority of the College, and thereby the state, when moving to terminate the Plaintiff from the fellowship program. This principle is illustrated by the Sixth Circuit's opinion in *Austin v. Diaz*. 194 F.3d 1311 (unpublished table decision), Nos. 98-1555, 98-1556, [published in full-text format at 1999 WL 970313] (6th Cir. Oct. 13, 1999). In *Diaz*, the plaintiff, Donald Austin, was a neurosurgeon at Harper Hospital, a private hospital, and an unpaid faculty member at Wayne State University Medical School. *Id.* at *1. Defendant Fernando Diaz served both as Chief of the Department of Neurosurgery for Harper Hospital and as Chairman of the Wayne State Neurological Surgery Department. *Id.* After Austin allegedly violated a written policy of Dr. Diaz's Departments by serving as an expert witness in a medical malpractice lawsuit, he was removed from his position as Vice Chair of the Neurosurgery Department at the hospital and his name was omitted from a brochure promoting the Wayne State University Neurological Surgery Department. *Id.* Plaintiff brought a § 1983 action against Harper Hospital and Diaz alleging retaliation under the First Amendment.

15

The Sixth Circuit affirmed the district court's finding that Harper Hospital was not a state actor under the nexus test. *Id.* at *2-3. This was despite the "clear cooperative" relationship between the hospital and university and Diaz's "dual positions" within the institutions. *Id.* at *3. The court found that evidence of a close relationship fell short of demonstrating that the university influenced the hospital or Diaz's decision to demote Austin within the Neurosurgery Department (the specific challenged conduct). *Id.* at *3-4. Relevant to the court's finding was the fact that the agreement between the hospital system and university did not provide for participation by the university in decisions involving the promotion of hospital staff. *Id.* at *3. Thus, the court found no evidence that "Diaz was acting in any capacity other than that as Chief of the Neurosurgery Department" of the hospital when he decided to demote him. *Id.* at *3-4.

The Third Circuit's opinion in *Borrell v. Bloomsburg University* is also instructive. 870 F.3d 154 (3rd Cir. 2017). In that case, the court found that the director of a joint public-private nursing program, Arthur Richer, did not engage in state action when he terminated a participant for violating the private hospital's drug and alcohol policy. *Id.* at 162. Richer was a dual employee of the private hospital and public university and managed the clinical portion of the program. *Id.* at 158. Another university employee, Michelle Ficca, managed the academic portion. *Id.* The private hospital maintained exclusive authority to dismiss a participant from the clinical portion of the program for failing to comply with hospital policy. *Id.* at 158. After consulting the hospital's human resources department, Richer decided to dismiss the plaintiff from the nursing program for violating the hospital's drug and alcohol policy. His university

counterpart, Ficca, did not participate in the decision-making process, although she did sign the letter of dismissal, along with Richer, indicating her support. Ultimately, the court found that the director did not act under the authority of the state when dismissing the plaintiff, but instead acted under the authority granted to him by the agreement between the hospital and university to unilaterally dismiss a participant for violating hospital rules. *Id.* at 161. Like in *Diaz*, the court in *Borrell* recognized that dual employment at public and private institutions does not end the inquiry into whether a particular defendant acted under color of state law when engaging *in the challenged conduct*, even when both institutions have a close relationship. *See id.* at 160.

Finally, cases in the Southern District of Ohio have found that a nurse employed by a private hospital who volunteers as a supervisor for the clinical aspect of a public university's nursing program does not engage in state action when evaluating a student's clinical performance. *Reeves v. Shawnee State Univ.*, No. 1:16-cv-765, 2018 WL 582555 (S.D. Ohio Jan. 29, 2018); *Siskaninetz v. Wright State Univ.*, 175 F. Supp. 2d 1018 (S.D. Ohio 2001). In *Siskaninetz*, the university dismissed a student from the nursing program based on the nurse's poor evaluations of the student's clinical work. 175 F. Supp. 2d at 1022. Reasoning that the university was not compelled to act on the nurse's recommendation, the court found that the university's decision did not "convert" the private nurse' evaluation into state action. *Id.* at 1025.

In the instant case, it is undisputed that UC College of Medicine has a close relationship with UC Medical Center and UC Health. As noted above, the standard terms and conditions governing the program state that the program is a "collaboration" between

17

UC Medical Center and UC College of Medicine, with the "academic components . . . developed and supervised by the College, which is solely responsible for determining whether a resident has satisfactorily completed the academic requirements." (Doc. 24-1 at 23). However, the closeness of this relationship and the dual roles of Drs. Risma, Bernstein, and Filak at the public and private institutions are insufficient to render their dismissal of Schwartz state action.

Plaintiff acknowledges that UC Health and UC Medical Center are not state agencies or entities. (Doc. 32-1 at ¶ 2; Doc. 42 at ¶ 2). The GME Contract governing Plaintiff's employment as a clinical fellow is between Plaintiff and UC Health on behalf of the UC Medical Center. (Doc. 24-1 at 22). The Contract gives UC Medical Center the authority to terminate the Contract for grounds specified in a set of incorporated terms and conditions. (*Id.*). UC Health sponsors the fellowship program, hired Plaintiff, and paid his salary and benefits. (Doc. 32-1 at ¶¶ 4, 14-15; Doc. 42 at ¶ 4, 14-15).

Plaintiff further acknowledges that he was dismissed for misconduct pursuant to Section 4.2 of the standard terms and condition, and not for academic reasons. (Doc. 35 at 11-13) ("Dr. Schwartz's expulsion was based on disciplinary as contrasted to academic grounds."). This supports a finding that the individual defendants were not acting on behalf of UC College of Medicine. The process by which Plaintiff was terminated maps directly onto the process for disciplinary misconduct outlined in Section 4.2. This process permits the program director and DIO to conduct an investigation into an identified issue. (Doc. 24-1 at 34). Such an inquiry is conducted by "a neutral physician, member of human resources or other appropriate person" who reviews any

documentation and meets with witnesses, including the resident.  (*Id.* at 35).  The program director then makes a recommendation to the DIO, who has final decision-making authority.  (*Id.*).  By contrast, the process for *academic dismissals* provides fellows an opportunity to request review by a panel consisting of "three neutral faculty members of the College."  (*Id.* at 33).  The review process for misconduct dismissals does not expressly involve oversight by the College.  This distinction reflects the structure of the program as described in the standard terms and conditions, which states that the College is solely responsible for determining whether a fellow has completed the academic requirements of the program.  (*Id.* at 23).

Plaintiff argues that the moonlighting policy that served as the basis for his dismissal is a policy over which the College shares oversight responsibility.  However, that position is not supported by the record.  The Court agrees that is not clear from the record whether the College played a role in developing the moonlighting policy or whether the College and UC Health/Medical Center share the same policy.  The standard terms and conditions state that fellows "agree[] to comply with the written moonlighting policies [plural] of UC Health, UCMC and College."  (Doc. 24-1 at 27).  The terms and conditions also state that "the moonlighting policy [singular] is available on the GME website or through the Office of Graduate Medical Education."  (*Id.*).  The only copy of a moonlighting policy found in the record has as its header: "The University of Cincinnati Medical Center/University of Cincinnati College of Medicine Graduate Medical Education."  (Doc. 28-1 at 2).  However, the body of the policy does not reference the College and refers to the policy as the "Cincinnati Medical Center Moonlighting Policy."

*Id.*

More importantly, the policy states that "[i]f a resident is in violation of the Cincinnati Medical Center Moonlighting Policy, the Program Director must take appropriate action to remedy the infraction consistent with the disciplinary policies outlined in the Graduate Medical Education Agreement." (*Id.*). Thus, the moonlighting policy expressly refers to the GME Contract as its enforcement mechanism. Again, this Contract between Plaintiff and UC Health gives the DIO, with consultation of the program director, the authority to dismiss a fellow for misconduct without approval from the College. Even assuming the policy is a "joint" policy, Plaintiff has not demonstrated how the individual defendants' enforcement of the policy pursuant to Plaintiff's GME Contract with UC Health constitutes state action.

Moreover, Plaintiff concedes that Dr. Filak was acting in his role as DIO when he dismissed Plaintiff from the fellowship program. (Doc. 32-1 at ¶ 9; Doc. 42 at ¶ 9). Dr. Filak testified that he fulfilled this role on behalf of UC Health. (Filak Depo. at 27; Filak Aff. at ¶ 1). While Plaintiff asserts that Dr. Filak terminated Schwartz in his capacity as DIO for *UC Medical Center*, as opposed to UC Health (Doc. 42 at ¶ 122), that distinction is irrelevant for purposes of showing state action, as Plaintiff recognizes that both institutions are private entities. Plaintiff points to no evidence to support a finding that Dr. Filak was acting on behalf of the College, other than his status as an employee of both UC Health and the College. This is insufficient to show state action.

Plaintiff also does not point to evidence in the record to support a finding that Drs. Risma and Bernstein were acting on behalf of UC College of Medicine when they

recommended Schwartz's dismissal. Pursuant to the standard terms and conditions of the program, incorporated by Schwartz's GME Contract, Drs. Risma and Bernstein, as program directors, had the authority to report Schwartz to the DIO for an investigation and to make a recommendation regarding his dismissal for misconduct without consulting the College. (Doc. 24-1 at 34-35). Likewise, Dr. Filak, as DIO, had the authority to make a final determination without input or review by the College. (*Id.*).

Plaintiff points to Dr. Filak's testimony that the "faculty of [] the College of Medicine staff the hospital and [] provide the clinical oversight of the program and the academic aspects of the training program." (Doc. 27 at 12). Yet, this statement is consistent with the fact that the College is involved in clinical oversight of the program to the extent that the program directors also have faculty appointments at the College. It does not, however, advance Plaintiff's argument that the individual defendants were acting in their role as College faculty members when dismissing Schwartz.

Plaintiff also notes the individual defendants' inclusion of their multiple titles in their signature blocks on e-mails and letters, as well as the use of joint letterhead, including on Drs. Risma and Bernstein's letter to Dr. Filak recommending Plaintiff's dismissal. (*See, e.g.*, Doc. 25-2 at 614; 24-6 at 7). However, other context clues indicate Drs. Risma and Bernstein were acting as program directors, not as university employees. For example, their letter recommending dismissal concludes, "we as program directors see no evidence Dr. Schwartz is capable of improving his professional behavior . . . ." (Doc. 25-2 at 614). Additionally, Dr. Filak's letter of dismissal is on "University of Cincinnati Medical Center/UC Health" letterhead and is signed "Designated Institutional

Official, Vice President for Education, University of Cincinnati Medical Center."  (Doc. 24-6 at 8).

In any event, the use of joint titles or letterhead does not counter the substantial record evidence that the individual defendants were not acting on behalf of UC College of Medicine, namely, Schwartz's employment contract with UC Health/UC Medical Center that incorporated a process for dismissal for misconduct without participation by UC College of Medicine, and Schwartz's acknowledgement that he was dismissed for misconduct pursuant to that process.  *See Tierney v. Vahle*, 304 F.3d 734, 741 (7th Cir. 2002); *see also Borrell,* 870 F.3d at 159.

 In sum, finding no dispute of fact material to the question of state action, the individual defendants are entitled to judgment as a matter of law.  Based on the record, no reasonable juror could conclude that the individual defendants' involvement in Schwartz's dismissal was fairly attributed to the state.  Accordingly, Defendants' motions for summary judgment against Plaintiff on Counts 1 (violation of the right to free speech) and 3 (violation of the right to procedural due process) (Docs. 32, 34) are **GRANTED**; and, for the same reason, Plaintiff's cross-motion for partial summary judgment on Count 3 regarding his Fourteenth Amendment procedural due process claim (Doc. 35) is **DENIED**.

### B.    Plaintiff's Title VII Retaliation Claim

Defendant UC Health also seeks summary judgment with respect to Plaintiff's retaliation claim under Title VII, in which Plaintiff claims that UC Health retaliated against him for speaking out about the incident of sex discrimination Plaintiff

experienced at the Finity Group dinner.[4]  To reiterate, Shakeith Lawson, the allergy fellowship program coordinator and administrative assistant, forwarded an e-mail from The Finity Group to program fellows, including the Plaintiff, inviting residents and fellows to attend an informational dinner for new doctors.  (Doc. 26-1 at 30-31).  The dinner took place at a restaurant in Northern Kentucky.  (Doc. 32-1 at ¶ 35; Doc. 42 at ¶ 35).  Schwartz arrived late to the dinner with his same-sex spouse, and the Finity Group seated Plaintiff and his husband in the main restaurant, rather than the private dining room where the presentation was taking place.  (Doc. 32-1 at ¶ 42; Doc. 42 at ¶ 42; Doc. 35-1 at ¶ 12-13).  The Finity Group gave Schwartz and his spouse a personal presentation and paid for their meal.  (Doc. 32-1 at ¶ 44; Doc. 42 at ¶ 44).  However, Schwartz suspected the Finity Group discriminated against him and his husband because he saw what appeared to be a heterosexual couple arrive at the presentation after him and be seated in the private dining room before the presentation ended.  (Doc. 35-1 at ¶¶ 13-14).  Plaintiff alleges that UC Health retaliated against him for reporting the incident of sex discrimination to Lawson and Dr. Filak.

Title VII prohibits employers from retaliating against an employee because the employee "has opposed any practice made an *unlawful employment practice* by this title . . ."  42 U.S.C. § 2000e-3(a) (emphasis added).  This includes an employee's opposition to employment discrimination by persons other than the employer, such as a

---

[4] In response to UC College of Medicine's motion for summary judgment, Plaintiff dropped his Title VII claim with respect to UC College of Medicine, acknowledging Defendant UC Health as his sole employer.  (Doc. 41 at 30).  Accordingly, the Court will analyze this claim solely with respect to Defendant UC Health.

former employer, a union, the plaintiff's coworkers, or the employer's customers.  EEOC Compliance Manual § 614(b)(5).

To establish a prima facie case for retaliation, a plaintiff must demonstrate the following factors: (1) he engaged in activity protected by Title VII, (2) this exercise of protected rights was known to the defendant, (3) the defendant took an adverse employment action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action.  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).  Once a plaintiff demonstrates these elements, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for plaintiff's discharge.  *Id.*  The plaintiff then has an opportunity to show that the preferred nondiscriminatory reason was pretextual.  *Id.*

A plaintiff alleging retaliation under Title VII is not required to prove that the discrimination complained of was actually unlawful; rather, a plaintiff need only demonstrate "a reasonable and good faith belief" that the discrimination complained of was a Title VII violation.  *See* EEOC Compliance Manual § 614(a); *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 469 (6th Cir. 2012); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) ("A person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful.").  This standard has both a subjective and objective component: the plaintiff must have subjectively believed he was experiencing employment discrimination, and that belief must be objectively reasonable taking into account the facts and circumstances.  *See Laughlin v. City of Cleveland*, 102

F. Supp. 3d 944, 951 (N.D. Ohio 2015) (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999)). A plaintiff may fail to demonstrate a reasonable, good-faith belief when he makes an unreasonable mistake of law, or when the facts and circumstances are such that no reasonable person could have believed that a Title VII violation occurred. *Wasek*, 682 F.3d at 649.

Plaintiff concedes that the challenged conduct was carried out by representatives of The Finity Group, and not by UC Health. Plaintiff states in his proposed undisputed facts that he sent an e-mail to Lawson about the incident, "complaining that he and his husband had been victims of discrimination *on the part of the Finity Group*." (Doc. 35-1 at ¶ 14) (emphasis added). Schwartz's e-mail to Lawson specifically stated that he attended the dinner and, "[u]nfortunately *they* practice discrimination (which I am sure they hid from you very well)." (Doc. 26-1 at 29-30) (emphasis added). Plaintiff also acknowledges that he did not recognize anyone from the College or UC Health at the dinner. (Doc. 32-1 at ¶ 37; Doc. 42 at ¶ 37).

While it is true that a plaintiff may properly allege retaliation under Title VII for opposing employment discrimination by someone other than his employer, Schwartz does not so much as allege that The Finity Group was engaging in *employment discrimination in violation of Title VII* by excluding him from the dinner. Nor does Plaintiff argue that a reasonable person in his shoes would have believed that exclusion from the dinner constituted an unlawful employment practice. *See, e.g.*, *Offutt v. Warren Cty. Reg'l Jail*, 109 F. App'x 740 (6th Cir. 2004) ("while the [employer's] punishment may have been unlawful under another statute, [plaintiff] produced no evidence that she

reasonably believed she was opposing racial discrimination protected by Title VII.").

Title VII prohibits "unlawful employment practices" including an employer's discrimination "against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer's forwarding of an e-mail invitation to an event, or even an employer's endorsement of an event, does not render any act of discrimination by a third-party at that event employment discrimination. Because Plaintiff does not so much as assert that what he experienced at The Finity Group dinner constituted employment discrimination, his claim fails. In addition, based on the circumstances, a reasonable person in Plaintiff's position would not have believed that exclusion from a dinner by a third-party constituted discrimination in violation of Title VII. Accordingly, finding no dispute of material fact, UC Health and UC Medical Center are entitled to judgment as a matter of law with respect to Plaintiff's retaliation claim under Title VII.

## IV. CONCLUSION

Based upon the foregoing,

1) Defendants David Bernstein, Andrew Filak, and UC Health's motion for summary judgment (Doc. 32) is **GRANTED**;

2) Defendants Kimberly Risma and the University of Cincinnati College of Medicine's motion for summary judgment (Doc. 34) is **GRANTED**;

3) Plaintiff's cross-motion for partial summary judgment (Doc. 35) is **DENIED**; and

4) The Clerk shall enter judgment accordingly, whereupon this case is **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

Date:  1/29/20                          /s/ Timothy S. Black
                                        Timothy S. Black
                                        United States District Judge